523 A.2d 333

**SUMMIT HOUSE CONDOMINIUM, Appellee,**

v.

**COMMONWEALTH of Pennsylvania, Appellant.**

**SUMMIT HOUSE CONDOMINIUM, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1986.

Decided March 30, 1987.

LeRoy S. Zimmerman, Atty. Gen., Paul S. Roeder, Deputy Atty. Gen., Harrisburg, for Com.

Gabriel N. Preston, W. Robert Landis, West Chester, for Summit House Condominium.

Before NIX, C.J., LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA, and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

The above captioned appeals were consolidated for argument due to a common factual basis. At issue herein is the refund of a sales tax paid on the purchases of electricity from July, 1972, through April, 1975. The purchases were made for the Summit House Condominium Complex (hereinafter "Summit House") by, initially, Spackman Associates [1]

1. Spackman Associates managed the Summit House during its development stage.

and, subsequently, the Summit House Condominium Council (hereinafter "Council"). The electricity was purchased in bulk from the Philadelphia Electric Company (hereinafter "PECO"), supplied through one electrical substation, and measured for the entire condominium complex (including common areas), through a single meter. The Council thereafter apportioned the cost of electricity to the unit owners on the basis of unit size.[2]

On February 24, 1975, Summit House filed a Petition for Refund with the Department of Revenue requesting a refund of $15,999.56 for sales tax paid by the Council from July 24, 1972 through April 30, 1975. The claim was subsequently raised to $16,577.96. On July 25, 1975, the Board of Review denied the refund. This decision was later affirmed by the Board of Finance and Revenue on December 26, 1975.

The matter was appealed to the Commonwealth Court which, on August 2, 1984, entered an order in favor of the Summit House and awarded judgment in the amount of $16,566.96, together with interest. The Commonwealth thereafter filed exceptions to the Commonwealth Court's decision. On May 1, 1985, the court sustained the Commonwealth's exception as to the award of interest and modified the original judgment to award a refund without interest.

The Commonwealth thereafter filed an appeal to this Court based on the Commonwealth's Court original decision of August 2, 1984. The Summit House filed a cross appeal directed to the Commonwealth Court's order of May 1, 1985, disallowing interest on the refund.

Two issues are presented in the instant appeal: (1) whether the purchase of electricity herein by the management firm and condominium council is exempt from a sales tax due to its ultimate, residential use; and (2) whether the Commonwealth is required to pay interest on the refund of a sales tax.

The relevant statutory sections read as follows:

**2.** As of May 1, 1975, each unit of the Summit House was individually metered.

§ 7202. Imposition of Tax

(a) There is hereby imposed upon each separate sale at retail of *tangible personal property* or services, as defined herein, within this Commonwealth a tax of six per cent of the purchase price, which tax shall be collected by the vendor from the purchaser, and shall be paid over to the Commonwealth as herein provided.

72 P.S. § 7202(a) (emphasis added).[3]

§ 7201 Definitions

.    .    .    .    .

(m) "Tangible personal property." Corporeal personal property including, but not limited to, goods, wares, merchandise, steam and natural and manufactured and bottled gas for non-residential use, electricity for non-residential use, intra-state telephone and telegraph service for non-residential use, spirituous or vinous liquor and malt or brewed beverages and soft drinks; but the term shall not include household supplies purchased at retail establishments for residential consumption, including but not limited to, soaps, detergents, cleaning and polishing preparations, paper goods, household wrapping supplies and items of similar nature, or sanitary napkins, tampons or similar items used for feminine hygiene. *Nor shall said term include steam, natural and manufactured and bottled gas, fuel oil, electricity or intrastate telephone or telegraphs service when purchased directly by the user thereof solely for his own residential use.*

72 P.S. § 7201(m) (emphasis added).[4]

The Commonwealth argues that the words "purchased directly by the user thereof solely for his own residential use" precludes Summit House from benefiting from the tax exemption because the electricity was not purchased directly by the individual condominium owner and was used for purposes other than providing power to the individual units.

---

3. Act of March 4, 1971, P.L. 6, No. 2, art. II, § 202, *as amended;* 72 P.S. § 7202.

4. Act of March 4, 1971, P.L. 6, No. 2, art. II, § 201, *as amended;* 72 P.S. § 7201.

Furthermore, the Commonwealth argues that since the electricity was bought at bulk rate by a management group (later the council), the transaction smacked of a commercial enterprise, not unlike a landlord/tenant situation to which this Court previously disallowed exempt status. *See Aldine Apartments, Inc. v. Commonwealth of Pennsylvania,* 493 Pa. 480, 426 A.2d 1118 (1981).

Summit House counters that the purchases of electricity were made by the individual unit owners acting in concert, and that the management firm and council were merely alter egos and/or agents of the owners, and not independent commercial enterprises.

The Commonwealth Court's award of the refund was based on the theory that "[t]he relationship between the Condominium Council, the management agent and the individual unit owners is rooted in agency not in business." The court perceived "no commercial interest coloring the purchases by the Council or management agent as there is in purchases by a landlord. The use intended by the purchasers here was the same ultimate residential use intended by the individual unit owners." *Summit House Condominium v. Commonwealth of Pennsylvania,* 84 Pa. Cmwlth. 291, 296, 479 A.2d 1162, 1164 (1984).

Our decision herein hinges on the interpretation of the relevant statutory sections. Section 1902 of the Statutory Construction Act advises us that when considering the intent of a statute's wording, we must be aware that "[t]he singular shall include the plural, and the plural, the singular." 1 Pa.C.S. § 1902.[5] Thus, the pertinent statutory section herein can appropriately be read as "when purchased directly by the [*users*] thereof solely for [*their*] own residential use." 72 P.S. § 7201(m). The foregoing analysis would seem to permit a group exemption provided the use to which the electricity was put was for residential purposes. However, it is necessary to resolve the issue of whether a group of users can purchase electricity through a single agent and still qualify for the residential exemption.

5. Act of December 6, 1972, P.L. 1339, No. 290, § 3; 1 Pa.C.S. § 1902.

In *Aldine Apartments v. Commonwealth of Pennsylvania*, 493 Pa. 480, 426 A.2d 1118 (1981), we were presented with the question of whether a landlord purchasing electricity for his tenants may avail himself of the sales tax exemption as provided by § 7201 of the Tax Reform Code. In denying the landlord tax exempt status, we held that "it is clear that the legislature intended to distinguish between purchases by those who intended to use the utility for their own residential use and those who purchased the tangible personal property for a commercial purpose." *Id.*, 493 Pa. at 484, 426 A.2d at 1120.[6] Furthermore, the facts in *Aldine* established that the landlord's purchase of electricity was not for the residential use of the buyer but rather to further his commercial interest in renting the units.

In the case at bar, the management firm and condominium council were essentially the alter ego of the individual unit owners, and thus distinguishable from the landlord/tenant scenario of *Aldine, supra.* In a landlord/tenant situation, the landlord's ultimate concern is for the perpetuation of his own commercial interest, whereas the condominium council here operated without any motive of profit or self-interest. A tenant is not liable when his landlord fails to pay a utility bill, but, as established in 68 Pa.C.S. § 3311(b), a judgment against the Council would have constituted a lien against each individual condominium unit owner. Moreover, the relationship of the two entities is not comparable: tenants exist for the landlord's purpose (commercial) while the council or management group exists for the unit owners' purpose (residential).

The Commonwealth contends that the Pennsylvania Code provides a regulation relevant to the discussion herein:

§ 32.25 Utility services, fuel oil, and gas for residential use.

6. The court supported this proposition concerning the intent of the legislature to ban commercial ventures from the tax exemption by underlining the fact that prior to 1971, the section in question simply read "when purchased solely for residential use." It was concluded by the court that the addition of the words "directly by the user thereof" confined the residential use exception of § 7201 to use by the purchaser.

Effective July 1, 1971, steam, natural, manufactured and bottled gas, fuel oil, electricity, and intrastate telephone and telegraph services shall be exempt from Pennsylvania sales and use taxes when purchased solely for residential use. The following guidelines should be used to determine the taxable status of a particular transaction:

(1) Utility services, fuel oil, and gas purchased by one party for consumption or use on behalf of another party is a commercial use and shall be subject to tax.

(2) Utility services, fuel oil, and gas sold to apartment houses, apartment complexes, or other multiple dwellings shall be subject to tax, except to the extent that they are billed directly to the consumer-resident exclusively for his own residential use of the portion of the premises occupied by him.

61 Pa.Code § 32.25. This contention lacks merit. As to subsection one, we have already stated that the council and the unit owners herein are one and the same for the purposes of purchasing utilities for the residential use of the individual unit owners. This transaction is not between two "parties" but rather the representation by a purchasing agent for a group of residential dwellers. Subsection two's reference to multiple dwellings must be interpreted in light of the section's preceding references. The doctrine of *ejusdem generis* mandates that "[g]eneral expressions used in a statute are restricted to things and persons similar to those specifically enumerated in the language preceding the general expressions." *Butler Fair and Agricultural Association v. Butler School District,* 389 Pa. 169, 178, 132 A.2d 214, 219 (1957). In subsection two the distinctive feature of the designated structures is their commercial aspect as well as the absence of ownership on the part of the dwellers. This is certainly contrary to the situation presented by a condominium setup. Applying this doctrine to subsection two of § 32.25, we conclude that the legislature intended to deny the refund to commercial multiple dwellings, but not

to a privately-owned condominium unit or units which happen to exist in a single complex.[7]

■ Finally, the purpose of the tax exemption herein was to aid the residential homeowner with the cost of energy. It should be irrelevant whether that homeowner resides in a single, detached home, or chooses instead the unique aspects of condominium living. The important factor is that the purchases of electricity herein were purely for residential use, and displayed none of the commercial attributes which caused a denial of the sales tax refund in past decisions from this Court. Thus, we agree with the Commonwealth Court that the residents of Summit House were entitled to this residential exemption.

The second issue, i.e., whether the Commonwealth is required to provide interest on a tax refund, has previously been addressed by this Court.

In the case of *Purdy Estate*, 447 Pa. 439, 291 A.2d 93 (1972), this Court was confronted with the question of "whether the Commonwealth, in the absence of any contract or statute, is liable for the payment of interest on the overpayment of inheritance taxes." *Id.*, 447 Pa. at 441, 291 A.2d at 94. In denying interest on the refund, we relied on two points: first, the fact that the Commonwealth did not solicit the overpayment, and second, "that a sovereign state is not liable for interest in any case, except where, expressly or by reasonable construction of a contract or statute, it has placed itself in a position of liability." *Id.*, 447 Pa. at 442, 291 A.2d at 95. *See also Commonwealth v. Philadelphia Gas Works*, 484 Pa. 60, 398 A.2d 942 (1979).

Summit House relies on our decision in *City of Pittsburgh v. Pennsylvania Department of Transportation*, 490 Pa. 264, 416 A.2d 461 (1980), which concluded that the

7. We have stated that the general term following specific terms can be interpreted differently than the preceding phrases when "there is something to show that a wider sense was intended." *Butler Fair and Agricultural Association v. Butler School District*, 389 Pa. 169, 178, 132 A.2d 214, 219 (1957). The phrasing herein is void of any contrary meaning which would necessitate a broader interpretation of "multiple dwellings."

Commonwealth Court did not abuse its discretion in awarding interest against the Commonwealth. The facts in that case are worthy of note. The City of Pittsburgh filed a petition for review in the nature of a mandamus to force the Commonwealth (PennDOT) to contribute its allotted share of expense for the reconstruction of a bridge within the city. PennDOT eventually paid the city the sum due, but refused to include any interest on that sum. On appeal, the Commonwealth Court awarded interest to the city.

In affirming the Commonwealth Court's award of interest against PennDOT, this Court held that the presumption that the Commonwealth is always ready to pay its debts, thereby alleviating the need to impose any damages for delay in the form of interest, was not present because PennDOT was not always ready to meet its obligation. In the instant action, the Commonwealth Court distinguished *City of Pittsburgh,* by stating that "[u]nlike *City of Pittsburgh,* the present case is not one in which the Commonwealth has been unable or unwilling to pay its debts, nor is it governed by the equitable principles applicable to mandamus actions. As such, it does not fall within the narrow exception set forth in *City of Pittsburgh,* and the rule in *Purdy Estate* still applies." *Summit House Condominium v. Commonwealth of Pennsylvania,* 89 Pa.Cmwlth. 68, 71, 491 A.2d 962, 963 (1985). We agree with this conclusion.

Summit House argues herein that unlike the scenario present in *Purdy Estate, supra,* where the taxes were paid voluntarily, Summit House was compelled to pay the tax for fear that electrical services would be terminated. Assuming, arguendo, that there is some merit to this contention, Summit House still has not rebutted the fundamental basis of the decision in *Purdy,* i.e., that a sovereign state is not liable for interest in any case absent statutory authority. In this case both parties agree that no such statutory authority existed to authorize an award of interest.[8]

8. We note that the General Assembly passed an act in 1982 (Act of December 9, 1982, No. 248, P.L. 1057) which provides *prospectively* for

Accordingly, we affirm the Order of the Commonwealth Court.

interest on a tax refund. Both parties herein agree that this law has no bearing on the instant matter. *See* 72 P.S. § 806.1.